UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORY LARSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HARMAN MANAGEMENT CORPORATION; 3SEVENTY, INC.,<br><br>Defendants. | No. 1:16-cv-00219-DAD-SKO<br><br>ORDER DENYING DEFENDANT HARMAN MANAGEMENT CORPORATION'S RENEWED MOTION TO STAY ACTION<br><br>(Doc. No. 167) |

This matter comes before the court on defendant Harman Management Corporation's motion to stay proceedings in this action. (Doc. No. 167.) A hearing on the motion was held on December 4, 2018. Attorney David Bird appeared telephonically on behalf of defendant Harman Management Corporation ("HMC"), and attorney Adam Bowser appeared telephonically on behalf of defendant 3Seventy, Inc. d/b/a TrueDialog ("3Seventy"). Attorney Stephen Taylor appeared telephonically on behalf of plaintiff Cory Larson. Having considered the parties' briefs and oral arguments, and for the reasons stated below, the court will deny the motion to stay.

/////

/////

/////

1

# BACKGROUND

**A.     Factual Background**

According to plaintiff's first amended complaint, defendants HMC and 3Seventy set out on a telemarketing campaign in 2012 to send coupons to consumers for restaurant food items via automated text messages. (Doc. No. 22 ¶ 19.) In response to one A&W Restaurant promotional offer, plaintiff texted the word "BURGER" to an SMS short code licensed to and operated by defendants. (*Id.* ¶¶ 21, 23.) After initially responding to plaintiff's text message, defendants allegedly stored plaintiff's telephone number and thereafter sent multiple unprompted and uninvited automated text messages related to other A&W Restaurant food items. (*Id.* ¶¶ 23–25.) Plaintiff received at least two such messages—on November 16, 2014, and on June 1, 2015—without his prior express written consent, and continued to receive such messages through February 2016. (*Id.* ¶ 28.)

Plaintiff alleges that defendants violated the Telephone Consumer Protection Act ("TCPA"), in part by using an automatic telephone dialing system ("ATDS") to send the uninvited text messages. Specifically, plaintiff alleges that defendants' system "has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." (*Id.* ¶¶ 37–41.) Alternatively, plaintiff also alleges that "[i]n the unlikely event that Defendant's system does not already have the capacity to generate random or sequential numbers, that capacity can be trivially added." (*Id.* ¶ 42.) Finally, plaintiff alleges that specific illustrative lines of computer code can be added to defendants' system to generate random and sequential numbers. (*See id.* ¶¶ 43–48.)

**B.     The Telephone Consumer Protection Act and Relevant Litigation**

The TCPA makes it unlawful for any person "to make any call . . . using any automatic telephone dialing system" to certain types of telephones without the called party's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). The term "automatic telephone dialing system" is defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

In 2015, the Federal Communications Commission ("FCC") adopted rules and regulations concerning the defining features of an ATDS. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) (effective July 10, 2015). Therein, the FCC took the position that the term "capacity" in the TCPA refers not only to a system's "present ability" to dial random or sequential numbers, but also to a system's potential ability to do so. *Id.* at 7974. Thus, even equipment that presently lacks software necessary to enable sequential or random dialing—but might later be programmed to do so—could constitute an ATDS. *Id.*

In March 2018, the D.C. Circuit issued a long-awaited opinion that set aside the FCC's interpretation of the TCPA regarding what constitutes an ATDS, finding that interpretation to be "an unreasonably, and impermissibly, expansive one." *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018). The D.C. Circuit rejected the FCC's understanding that any uninvited call or message from devices that have any "capacity" to function as an autodialer constitutes a TCPA violation. *Id.* at 697 ("The TCPA cannot reasonably be read to render every smartphone an ATDS subject to the Act's restrictions, such that every smartphone user violates federal law whenever she makes a call or sends a text message without advance consent."). The D.C. Circuit concluded that the FCC's interpretation of the term "capacity" in the definition of an ATDS was unreasonably broad, and that there was no indication that Congress intended the statute to apply to ubiquitous devices such as cellphones. *Id.* at 699. The D.C. Circuit acknowledged that "[v]irtually any understanding of 'capacity' . . . contemplates some future functioning state, along with some modifying act to bring that state about." *Id.* at 696. However, the court concluded that a determination of "capacity" as an ATDS should take into consideration how much the device's current functions needed to be altered or supplemented to function as an autodialer. *Id.* at 696.

On September 20, 2018, in the absence of FCC regulations, the Ninth Circuit issued its opinion in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018), interpreting the TCPA definition of an ATDS. The Ninth Circuit concluded that "the statutory definition of ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." *Id.* at 1043. That court also

concluded that an ATDS "means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person) . . .." *Id.* at 1053.

**C.     Defendant HMC's Prior Motions to Stay**

On June 8, 2017, defendant HMC filed its first motion to stay proceedings in this case, pending the issuance of the D.C. Circuit's decision in *ACA International*, arguing that resolution of the issues in that case would directly affect plaintiff's claims here. (Doc. No. 65 at 8.) On July 26, 2017, the court issued an order denying that motion to stay without prejudice. (Doc. No. 73.)

On February 1, 2018, defendant HMC filed a renewed motion to stay all proceedings in this action, again pending the decision in *ACA International*. (Doc. No. 108.) While that motion to stay was under submission, the D.C. Circuit issued its decision in *ACA International*, and on March 20, 2018, defendant HMC withdrew the motion to stay. (Doc. No. 122.)

On October 30, 2018, defendant HMC filed the instant motion to stay. (Doc. No. 167.) Plaintiff filed an opposition on November 20, 2018. (Doc. No. 169.) Defendant HMC filed a reply on November 27, 2018. (Doc. No. 171.)

**D.     Pending Motions**

Several motions have been filed in this case. On January 23, 2018, plaintiff filed a motion for class certification. (Doc. No. 98.) On January 30, 2018, defendant 3Seventy, Inc. filed a motion for summary judgment. (Doc. No. 101.) On April 16, 2018, defendant HMC filed a motion for summary judgment. (Doc. No. 128.)

On November 21, 2018, the parties submitted a third joint stipulation to amend the scheduling order in this case, requesting an extension of the November 30, 2018 deadline for the filing dispositive motions. (Doc. No. 170.) The parties requested that the deadline be amended to permit the filing of dispositive motions up until thirty days after the issuance of the court's rulings on the already pending dispositive motions. (*Id.* at 2.) On November 28, 2018, the assigned magistrate judge denied the parties' joint request to amend the scheduling order. (Doc. No. 170.)

/////

On November 30, 2018, defendant HMC filed a second motion for summary judgment, which is noticed for a hearing on February 20, 2018. (Doc. No. 174.) The pretrial conference is currently scheduled for March 25, 2019, and the trial is currently scheduled for May 21, 2019.[1]

**LEGAL STANDARD**

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *accord Stone v. INS*, 514 U.S. 386, 411 (1995) ("[W]e have long recognized that courts have inherent power to stay proceedings and 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'") (Breyer, J., dissenting) (quoting *Landis*, 299 U.S. at 254)). Deciding whether to grant a stay pending the outcome of other proceedings "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254–55. The party seeking such a stay must "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one [sic] else." *Id.* at 255. In considering whether to grant a stay, this court must weigh several factors, including "[1] the possible damage which may result from the granting of a stay, [2] the hardship or inequity which a party may suffer in

---

[1] At the hearing on the instant motion for a stay, the undersigned briefly discussed with all counsel the scheduling issues raised by the motions for class certification and summary judgment already under submission for decision, defendant HMC's second motion for summary judgment noticed for hearing on February 20, 2018, and the currently scheduled final pretrial conference and trial dates. Having now resolved the motion for stay by this order, the court is inclined to keep the other pending motions under submission until after the February 20, 2018 hearing on defendant HMC's second motion for summary judgment, which significantly overlaps with its first such motion, and address all submitted motions by order(s) thereafter. The court is not inclined to vacate the current March 25, 2019 final pretrial conference date or May 21, 2019 trial dates at this time. However, unless the court can address all remaining pending motions by order immediately following the February 20 hearing, a questionable proposition at best considering this court's caseload, the final pretrial conference and trial dates will almost surely have to be rescheduled. If counsel wish the court to consider another stipulation of the parties with respect to scheduling, the court will do so. Alternatively, if the parties have concerns about the court's intention as stated above and wish to further discuss scheduling at a telephonic scheduling conference, they are directed to contact Courtroom Deputy Jami Thorp to arrange a date and time for that purpose.

being required to go forward, and [3] the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962) (citing *Landis*, 299 U.S. at 254–55). A stay may be granted regardless of whether the separate proceedings are "judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979).

**DISCUSSION**

Defendant argues that the court should stay this case pending the FCC's anticipated issuance of a regulation addressing the definition of an ATDS, based on either the doctrine of primary jurisdiction or the court's inherent authority to manage its docket. (Doc. No. 168 at 7.) Plaintiff opposes defendant's motion, contending that the primary jurisdiction doctrine does not support a stay, largely because after the decision in *Marks*, controlling Ninth Circuit authority already exists as to that question. (Doc. No. 169 at 8.) Plaintiff also argues that a stay will not simplify the issues in this case in light of this binding authority, that plaintiff will be prejudiced by a stay, and that denial of a stay will not create a clear case of hardship or inequity for defendant. (*Id.* at 5.)

**A.     Primary Jurisdiction**

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). The doctrine does not "deprive the court of jurisdiction," but rather permits the court to refer to an administrative agency a claim involving "an issue within the agency's special competence . . . ." *Reiter v. Cooper*, 507 U.S. 258, 259 (1993). "The primary jurisdiction doctrine prescribes deference to an administrative agency where (1) the issue is not within the conventional experiences of judges, (2) the issue involves technical or policy considerations within the agency's particular field of expertise, (3) the issue is particularly within the agency's discretion, or (4) there exists a substantial danger of inconsistent rulings." *Maronyan v. Toyota Motor Sales,*

*U.S.A., Inc.*, 658 F.3d 1038, 1048 (9th Cir. 2011) (citing *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172–73 (9th Cir. 2002)) (internal citations omitted). The doctrine is not intended as a way for courts to "secure expert advice" from administrative agencies "every time a court is presented with an issue conceivably within the agency's ambit," but instead is only appropriately invoked in cases involving "an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Brown*, 277 F.3d at 1172.

Here, the court concludes that the doctrine of primary jurisdiction does not support a stay of this action pending the FCC's issuance of a regulation defining an ATDS. In *Marks*, the Ninth Circuit held that an ATDS "means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator— and to dial such numbers automatically (even if the system must be turned on or triggered by a person) . . .." *Marks*, 904 F.3d at 1053. Moreover, the Ninth Circuit concluded in *Marks* that there existed genuine issues of material fact as to whether the system at issue was an ATDS, and remanded the case to the district court for further proceedings. *Id.* The opinion in *Marks* was issued on September 20, 2018, well after the FCC began seeking public comments on what constitutes an ATDS in May of 2018, following the D.C. Circuit's issuance of the decision in *ACA International*. The opinion in *Marks* therefore stands as the controlling authority on this issue in the Ninth Circuit and is binding on this court.

The Ninth Circuit's willingness to decide the meaning of an ATDS in *Marks* also indicates that defining that term as used in the applicable statute is within the conventional experience of judges and does not involve technical or policy considerations that would place it particularly within the FCC's field of expertise or discretion. *See Maronyan*, 658 F.3d at 1048; *see also Baum v. ADT LLC*, No. CV 18-0777, 2018 WL 5255219, at *5 (W.D. Pa. Oct. 22, 2018) ("[W]hether courts have tackled the issue before goes directly to whether this judicial court could competently address the same matter in the case before it now."). Following *Marks,* the question of what constitutes an ATDS is no longer an issue of first impression in this circuit. *See Marks*, 904 F.3d at 1053. Though there may be some risk of inconsistent rulings involving specific

7

issues not explicitly addressed by the court in *Marks*, such is the case in every developing area of law. Furthermore, there is no indication, much less any guarantee, that future FCC actions in the form of regulations or otherwise will provide guidance on or resolution of the specific issues before the court in this case.

Despite defense counsel's optimism that FCC guidance is forthcoming, any stay based on future FCC action may be indefinite in length. Notably, the FCC has not indicated how it intends to proceed in light of the D.C. Circuit's decision in *ACA International*. *See Baum*, 2018 WL 5255219 at *5 ("It is not clear when the FCC will issue any new guidance relative to the issues here, especially in light of the FCC's most recent notice just weeks ago seeking further comment."); *Gould v. Farmers Ins. Exch.*, 326 F.R.D. 530, 531 (E.D. Mo. 2018) (denying defendant's request for stay in August 2018 pending FCC action following the decision in *ACA International*, because "the FCC has not indicated whether it will pursue a formal rulemaking or some other proceeding following the collection of comments on this issue" and therefore, a stay could be indefinite); *Pieterson v. Wells Fargo Bank, N.A.*, No. 17-CV-02306-EDL, 2018 WL 3241069, at *5 (N.D. Cal. July 2, 2018) ("The timing of a new order from the FCC is also uncertain. The FCC has expedited the public comment period, but that does not guarantee that an order will be issued in the immediate or near future. This process can take years."). Further, any action from the FCC "will be subject to further challenge, which is exactly what happened with the 2015 Declaratory Ruling." *Pieterson*, 2018 WL 3241069, at *5. This court should not indefinitely delay resolution of this case under these circumstances, and therefore concludes that the primary jurisdiction doctrine does not support the granting of defendant's motion for a stay.

**B.      Inherent Authority to Stay**

Defendant also asks the court to consider issuing a stay based on its inherent authority. The court begins its analysis, as the Supreme Court did in *Landis*, by inquiring whether there is "a fair possibility that [a] stay . . . will work damage" to the non-moving party. *Landis*, 299 U.S. at 255. A short stay in this action will likely result in little damage, if any, to plaintiff and the putative class. However, as discussed above, the court is not at all convinced that a stay of this case would necessarily be short and there is a significant risk that it would be essentially

indefinite, since there is no clear indication that any FCC action is on the horizon. *See Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096, 1101 (N.D. Cal. 2016) (concluding that there is a "fair possibility of harm" to plaintiff because of the indefinite length of the stay); *Lathrop v. Uber Techs.*, Inc., No. 14-CV-05678-JST, 2016 WL 97511, at *4 (N.D. Cal. Jan. 8, 2016) (concluding that plaintiffs in putative class action may "suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate"). Thus, consideration of this factor weighs against the granting of a stay.

Next, the court must examine whether defendant has made out "a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 254–55. Here, defendant merely states that its hardship is being deprived of the opportunity to wait for another decision on a potentially controlling point of law. (Doc. No. 168 at 14.) Defendant does not identify any specific issues that would be resolved by waiting for future action from the FCC. Where defendants have not identified any specific harm beyond the cost of litigation, it has been held that "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005). Accordingly, consideration of this factor also weighs against the imposition of a stay.

Finally, the court must look to whether there is a benefit to "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX*, 300 F.2d at 268. In its motion, defendant states that this court "risks issuing a decision that conflicts with, and is preempted by, the FCC's forthcoming regulations or other guidance addressing the ATDS issues raised by the Joint Trade Petition and the FCC's Public Notices seeking comment." (Doc. No. 168 at 15.) However, the Ninth Circuit has already decided what constitutes an ATDS and other district courts in this circuit have applied that binding authority. *See N.L. by mother Lemos v. Credit One Bank, N.A.*, No. 2:17-CV-01512-JAM-DB, 2018 WL 5880796, at *1 (E.D. Cal. Nov. 8, 2018); *Shupe, et al., v. Capital One Bank USA NA*, No. CV-16-00571-TUC-JGZ, 2018 WL 5298396, at *4 (D. Ariz. Oct. 25, 2018), *appeal docketed,* No. 18-17181 (9th Cir. Nov. 9, 2018); *Michael Keifer v. Hosopo*

*Corp.*, No. 3:18-cv-1353-CAB-(KSC), 2018 WL 5295011, at *1 (S.D. Cal. Oct. 25, 2018). Although future action by the FCC may ultimately impact the applicable law, the court concludes that at this stage of this action which was filed in 2016, the imposition of a stay would provide little benefit to the orderly course of justice.

**CONCLUSION**

Accordingly, defendant HMC's renewed motion to stay (Doc. No. 167) is denied.

IT IS SO ORDERED.

Dated: **December 10, 2018**

UNITED STATES DISTRICT JUDGE