1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CORY LARSON, on behalf of himself and        No. 1:16-cv-00219-DAD-SKO
     all others similarly situated,
12
                    Plaintiffs,
13                                                 ORDER GRANTING PLAINTIFF'S MOTION
          v.                                       FOR PRELIMINARY APPROVAL OF
14                                                 CLASS ACTION SETTLEMENT
     HARMAN-MANAGEMENT
15   CORPORATION,
                                                   (Doc. No. 192)
16                  Defendant.

17

18          This action came before the court on July 16, 2019 for a hearing on plaintiff's motion for

19   preliminary approval of class action settlement.  (Doc. No. 192.)  The motion is unopposed.

20   Attorney Stephen Taylor appeared telephonically on behalf of plaintiff.  Attorneys David Bird

21   and Martin Jaszczuk appeared telephonically on behalf of defendant Harman-Management

22   Corporation ("Harman").  (Id.)  Based on the court's review of the pending motion and the

23   information presented by counsel at the hearing, the court will grant the motion for preliminary

24   approval of the class action settlement.

25                          **FACTUAL BACKGROUND**

26          Harman is "a nationwide franchisee of several fast-food restaurant chains[,] including

27   KFC, Taco Bell, Pizza Hut and A&W Restaurants."  (Doc. No. 22 at 2.)  On February 17, 2016,

28   plaintiff Cory Larson filed this class action on behalf of himself and all similarly situated

individuals, alleging that defendants Harman and 3Seventy, Inc.[1] ("3Seventy") sent unauthorized, automated text messages to putative class members' cellular phones in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* (the "TCPA"). (Doc. No. 1.) Plaintiff's first amended complaint ("FAC") alleged that, in 2012, Harman and 3Seventy "set out on a telemarketing campaign to send consumers coupons for Harman restaurant food items via automated text messages" and that, "[b]y the beginning of 2014, Defendants were text messaging more than 150,000 consumers." (Doc. No. 22 at 5–6.) Plaintiff alleged that "Defendants sent [him] and other consumers its automated telemarketing text messages without obtaining clear and conspicuous prior express written consent as required by the TCPA." (*Id.* at 2.) Plaintiff also claimed that these messages were sent "as part of a marketing program called the 'A&W Text Club.'" (Doc. No. 193 at 6.) The FAC sought injunctive relief prohibiting similar violations of the TCPA by defendants in the future; statutory damages of $500.00 for each and every call/text in violation of the TCPA; and treble damages of up to $1,500.00 for each and every call/text in violation of the TCPA. (Doc. No. 22 at 15–16.)

After plaintiff filed suit, the parties "heavily litigated this case." (Doc. No. 193 at 6.) Plaintiff reviewed "over 46,000 pages of documents produced by Harman, 3Seventy or from third parties," including "emails, contracts, system manuals, slideshows, reports of the progress of the A&W Text Club, [and] audiovisual materials such as videos and web advertisements." (*Id.*) In addition, plaintiff took seven depositions of Harman, 3Seventy, and non-party employees, and Harman took plaintiff's and his expert's depositions and forensically examined plaintiff's cellular phone. (*Id.* at 6–7.) Moreover, the parties engaged in extensive motion practice, including a motion to dismiss and to strike plaintiff's class allegations (Doc. No. 26), three motions to stay (Doc. Nos. 64, 108, 167), three motions for summary judgment (Doc. Nos. 101, 128, 174), and a motion for class certification (Doc. No. 98).

---

[1] On June 12, 2019, plaintiff and defendant 3Seventy stipulated to dismissing 3Seventy from this action without prejudice, and the court thereafter gave effect to their stipulation. (*See* Doc. Nos. 194, 195.) That stipulated dismissal will convert to a dismissal with prejudice upon entry of a final order from this court approving a class settlement between settlement class and defendant Harman. (Doc. No. 194 at 2.)

In December 2018, the parties agreed to engage in settlement negotiations by way of mediation before the Honorable Morton Denlow (Ret.). (Doc. No. 193 at 7.) On February 19, 2019, after the parties provided Judge Denlow with detailed mediation briefs, he presided over a full day of negotiations between the parties which did not result in a settlement being reached. (*Id.*) Following that mediation session, however, the parties continued their discussions and eventually reached the proposed settlement agreement that is now before the court (the "proposed settlement agreement"). (*Id.*; *see also* Doc. No. 193-1, Ex. A.)

Pursuant to the proposed settlement agreement, Harman has agreed to deposit $4,000,000.00 into a settlement fund. (Doc. No. 193-1, Ex. A at 11–12.) "Settlement Class Members who timely submit a valid claim form will receive a pro-rata distribution from the settlement fund, after the Attorneys' Fees and Costs, any Incentive Award to the Named Plaintiff, and any Settlement Administration Costs are deducted from the Settlement Fund and the Settlement Administrator reviews all Claim Forms to determine a final number of claimants." (Doc. No. 193 at 9.) While the agreement does not provide for any specific incentive or fee award, class counsel "will apply for an Incentive Award of up to $10,000 for the Class Representative and of up to 1/3 of the Settlement Fund ($1,333,333.33) in Class Counsel Fees." (*Id.* at 10.) The parties agree that "[t]he Court and only the Court shall determine the amount of Attorneys' Fees and Costs and any Incentive Award in this action." (*Id.*)

On June 12, 2019, plaintiff filed the pending motion for preliminary approval of the class action settlement. (Doc. No. 193.) Plaintiff seeks an order: (1) preliminarily approving the terms of the Proposed Settlement Agreement; (2) appointing plaintiff as the class representative; (3) appointing attorneys Sergei Lemberg and Stephen Taylor of Lemberg Law, LLC as class counsel; (4) conditionally certifying the putative settlement class; (5) approving and directing distribution of the class notice packet to class members; and (6) scheduling a final fairness hearing with respect to the proposed settlement agreement. (Doc. No. 193 at 8.)

At the hearing on the motion for preliminary approval, the court requested supplemental briefing regarding the appropriateness of requiring class members to submit claim forms to recover from the settlement fund, as well as the overall reasonableness of the settlement fund in

light of the estimated maximum value of the class's claims.  On July 23, 2019, plaintiff filed supplemental briefing as requested by the court.  (Doc. No. 198.)

**LEGAL STANDARD**

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation and internal quotations omitted).  To protect the rights of absent class members, Rule 23(e) of the Federal Rules of Civil Procedure requires that the court approve all class action settlements "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946.  Moreover, it has been recognized that when parties seek approval of a settlement agreement negotiated prior to formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Bluetooth*, 654 F.3d at 946.  Thus, the court must review such agreements with "a more probing inquiry" for evidence of collusion or other conflicts of interest than what is normally required under the Federal Rules. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *see also Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

When parties seek class certification only for purposes of settlement, Rule 23 "demand[s] undiluted, even heightened, attention" to the certification requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  The district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing. *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014); *West v. Circle K Stores, Inc.*, No. 04-cv-0438 WBS GGH, 2006 WL 1652598, at *2 (E.D. Cal. June 13, 2006).

Review of a proposed class action settlement ordinarily involves two hearings. *See Manual for Complex Litigation* (4th) § 21.632.  First, the court conducts a preliminary fairness evaluation and, if applicable, considers class certification.  If the court makes a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms, the parties are directed to prepare the notice of certification and proposed settlement to the class members. *Id.* (noting that if the parties move for both class certification and preliminary approval, the

4

certification hearing and preliminary fairness evaluation can usually be combined).  Second, the court holds a final fairness hearing to determine whether to approve the settlement.  *Id.*; *see also Narouz v. Charter Commc'ns, Inc.*, 591 F.3d 1261, 1266–67 (9th Cir. 2010).

Here, the parties move for preliminary approval of a class settlement and preliminary class certification.  Though Rule 23 does not explicitly provide for such a procedure, federal courts generally find preliminary approval of settlement and notice to the proposed class appropriate if the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval." *Lounibos v. Keypoint Gov't Solutions Inc.*, No. 12-00636, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)); Newberg on Class Actions § 13:13 (5th ed. 2011); *see also Dearauju v. Regis Corp.*, Nos. 2:14-cv-01408-KJM-AC, 2:14-cv-01411-KJM-AC, 2016 WL 3549473 (E.D. Cal. June 30, 2016) ("Rule 23 provides no guidance, and actually foresees no procedure, but federal courts have generally adopted [the process of preliminarily certifying a settlement class].").

## ANALYSIS

### A.    Preliminary Evaluation of Fairness of Proposed Class Action Settlement

Plaintiff seeks preliminary approval of the proposed settlement agreement.  (*See* Doc. No. 193.)  As noted, under Rule 23(e), a court may approve a class action settlement only if the settlement is fair, reasonable, and adequate.  *Bluetooth*, 654 F.3d at 946.  "[P]reliminary approval of a settlement has both a procedural and substantive component."  *See, e.g.*, *In re Tableware Antitrust Litigation*, 484 F. Supp. 2d at 1079 (citing *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 570 n.12 (E.D. Pa. 2001)).  In particular, preliminary approval of a settlement and notice to the proposed class is appropriate if:  (i) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (ii) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class.  *Id.*; *see also Ross v. Bar None Enterprises, Inc.*, No. 2:13–cv–00234–KJM–KJN, 2014 WL 4109592, at *9 (E.D. Cal.

Aug. 19, 2014).  While it is not a court's province to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," a court should weigh the strength of a plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the stage of the proceedings; and the value of the settlement offer.  *Chem. Bank v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

        1.       The Proposed Settlement Agreement Appears to be the Product of Serious, Informed, Non-Collusive Negotiations.

      The court must first consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining, rather than collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).  A settlement is presumed fair if it "follow[s] sufficient discovery and genuine arms-length negotiation."  *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004)).  In addition, participation in mediation "tends to support the conclusion that the settlement process was not collusive."  *Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM, 2015 WL 4078135, at *8 (E.D. Cal. July 6, 2015) (citation omitted).

      Here, the proposed settlement agreement appears to be the product of serious, substantial, and arm's length negotiations.  As discussed above, the parties reached the agreement after engaging in extensive discovery and motion practice and after participating in a mediation before Retired Judge Denlow.  (Doc. No. 193 at 6–7, 14–15.)  Specifically, this litigation resulted in production of over 46,000 pages of documents, several expert reports and depositions, and several dispositive motions, including three summary judgment motions.  (*Id.* at 15.)  The parties then adjourned the briefing schedule on Harman's second motion for summary judgement to engage with the mediation before Judge Denlow.  (*See* Doc. Nos. 182, 183.)  Although that mediation session concluded without a settlement being reached, the parties continued to engage in negotiations and eventually arrived at the proposed settlement agreement.  Based upon this history, the court is convinced that the parties' negotiations were extensive, involved, and non-

6

1  collusive, lending credence to the fairness of the settlement and supporting the granting of

2  plaintiff's motion for preliminary approval.

3          2.      The Proposed Settlement Agreement Does Not Contain Obvious Deficiencies.

4          A proposed settlement does not meet the test for preliminary fairness if there are any

5  obvious deficiencies in the proposed agreement. *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d

6  at 1079. Here, the settlement states that defendant Harman shall deposit $4,000,000.00 into a

7  non-reversionary settlement fund to settle this action. (Doc. Nos. 193 at 17; 193-1, Ex. A at 11–

8  12.) This total includes amounts to be paid to class members, awards for attorneys' fees and

9  costs, an incentive payment for the named plaintiff, and the settlement administration expenses.

10 (Doc. No. 193-1, Ex. A at 14.) The parties propose that the awards for attorneys' fees and costs,

11 an incentive payment for the named plaintiff, and that the settlement administration expenses be

12 deducted from the settlement fund prior to the *pro rata* distribution of benefits to the settlement

13 class. (*Id.*) However, the agreement makes clear that the settlement is not conditioned on any

14 particular amount for either the incentive award or award of attorneys' fees. (*Id.* at 32.) Further,

15 to the extent that settlement checks remain uncashed after the void date, the agreement provides

16 for a second distribution of funds to class members, provided that this second distribution is not

17 cost-prohibitive, as determined by the settlement administrator. (Doc. No. 193-1, Ex. A at 12.) If

18 a second distribution is determined to not be feasible, the settlement administrator will pay any

19 remaining funds to the *Cy Pres* recipient(s) approved by this court. (*Id.* at 12–13.) The

20 settlement provides a means for class members to exclude themselves from the settlement (*id.* at

21 20–21), and the release of liability appears reasonably tailored to the claims presented in the

22 action for class members, with the named plaintiff agreeing to a general release of all claims. (*Id.*

23 at 28–32). Finally, the agreement provides for the settlement administrator to coordinate notice to

24 the class, any requests for exclusion, and payments to class members upon final approval. (*Id.* at

25 13–14, 20.)

26         Based upon this showing, the court is satisfied there are no obvious deficiencies with the

27 proposed settlement agreement.

28 /////

1    3.      The Proposed Settlement Agreement Does Not Improperly Grant Preferential

2            Treatment to Class Representatives or Segments of the Class.

3            In making a preliminary fairness determination, the court must assure itself that the

4    proposed settlement does not provide preferential treatment to certain members of the class or to

5    the named plaintiff. *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079.  As noted above,

6    the settlement terms here provide for the settlement amount to be divided among class members

7    in equal shares.  (Doc. No. 193 at 19.)  The court therefore turns to the attorneys' fees provisions

8    and the anticipated incentive award.

9            a.      Attorneys' Fees

10           When a negotiated class action settlement includes an award of attorneys' fees, the fee

11   award must be evaluated in the overall context of the settlement. *Knisley v. Network Assocs.*, 312

12   F.3d 1123, 1126 (9th Cir. 2002).  Where, as here, fees are to be paid from a common fund, the

13   relationship between the class members and class counsel "turns adversarial." *In re Washington*

14   *Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  Thus, the district court

15   must assume a fiduciary role for the class members in evaluating a request for an award of

16   attorneys' fees from the common fund. *Id.*; *Rodriquez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th

17   Cir. 2009).  Similarly, while "[i]ncentive awards are fairly typical in class action cases,"

18   *Rodriquez*, 563 F.3d at 958–59, "district courts must be vigilant in scrutinizing all incentive

19   awards to determine whether they destroy the adequacy of the class representatives . . ..

20   [C]oncerns over potential conflicts may be especially pressing where . . . the proposed service

21   fees greatly exceed the payments to absent class members." *Radcliffe v. Experian Info. Sols.,*

22   *Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citations omitted).

23           The Ninth Circuit has approved two methods for determining attorneys' fees in cases

24   where the attorneys' fee award is taken from the common fund set aside for the entire settlement:

25   the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290

26   F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).  The district court retains discretion in

27   common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.,* No.

28   CV 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016).  Under either

approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Here, plaintiff's counsel state that they will seek attorneys' fees in the total amount not to exceed one-third of the ultimate gross settlement amount. (Doc. No. 193 at 10.) Accordingly, assuming the gross settlement amount remains at $4,000,000.00, plaintiffs' co-counsel will seek a total award of attorneys' fees in an amount not to exceed $1,333,333.33. (*Id.*) This fee amount is above the Ninth Circuit benchmark amount. *See Bluetooth*, 654 F.3d at 947 (setting a 25% benchmark); *Staton*, 327 F.3d at 952 (same); *Six (6) Mexican Workers*, 904 F.2d at 1311 (same). However, that percentage is not unreasonable as an upper bound. *See Vizcaino*, 290 F.3d at 1047 (observing that percentage awards of between twenty and thirty percent are common); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377 (N.D. Cal. 1989) ("This court's review of recent reported cases discloses that nearly all common fund awards range around 30% even after thorough application of either the lodestar or twelve-factor method."). Reasons to vary the benchmark award may be found when counsel achieves exceptional results for the class, undertakes 'extremely risky' litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis. *Vizcaino*, 290 F.3d at 1048–50; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954 (9th Cir. 2015). An explanation is necessary when the district court departs from the twenty-five percent benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000). Ultimately, however, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." Vizcaino, 290 F.3d at 1048." Accordingly, while preliminary approval will be granted, in connection with the final fairness hearing, the court will consider any objections as well as the evidence presented by counsel in order to determine whether the award of an above-benchmark percentage in attorneys' fees is reasonable in this case. *See Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000) (noting that an explanation is necessary when the district court departs from the twenty-five percent benchmark).

/////

*b.* *Incentive Payments*

As the named plaintiff in this class action, plaintiff Larson will also seek an incentive award in an amount not to exceed $10,000.00. (Doc. No. 193 at 10.) This incentive award is significantly higher than the average recovery amount of individual class members. However, courts in this circuit have approved enhancement awards in this amount, and such an award here would not necessarily be "outside the realm of what has been approved as reasonable by other courts." *Aguilar v. Wawona Frozen Foods,* No. 1:15cv00093 DAD EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (and cases cited therein); *see also Brown v. Hain Celestial Grp., Inc.*, No. 3:11-cv-03082-LB, 2016 WL 631880, at *9 (N.D. Cal. Feb. 17, 2016) (approving an enhancement award of $7,500 to each class representative). Plaintiff contends that the requested incentive award is appropriate in light of his efforts expended during the course of the litigation. At the July 16, 2019 hearing on the pending motion, plaintiff's counsel indicated that plaintiff will provide additional information regarding the time he expended on this litigation and other reasons for why he is seeking an incentive award not to exceed $10,000.00. While preliminary approval will be granted, the court will review the additional evidence presented at the final approval hearing in determining whether a $10,000.00 incentive award to plaintiff Larson is ultimately warranted in this case.

4. The Proposed Settlement Agreement is Within the Range of Possible Approval.

To evaluate the fairness of the settlement award, the court should "compare the terms of the compromise with the likely rewards of litigation." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). To determine whether a settlement "falls within the range of possible approval" a court must focus on "substantive fairness and adequacy," and "consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

/////

As discussed above, the total proposed settlement fund here is for $4,000,000.00. Assuming plaintiffs' counsel receives one-third of the settlement amount in attorneys' fees, plaintiff Larson receives a $10,000.00 incentive award, and the cost of settlement administration is $209,557.00, the class members will share $2,446,666.66. (Doc. No. 193 at 19.) Class members who submit a timely, valid claim form will receive a pro-rata distribution from these remaining funds. (*Id.* at 9.) Plaintiff notes that Harman's "total exposure here is in the billions of dollars with 13.5 million messages having been sent as part of the A&W Text Club," given that the TCPA provides for damages of $500 for each violation, (which can be tripled to $1500 for violations that are willful. (Doc. No. 198 at 7–8.) Plaintiff, however, contends that "[t]he value of the settlement is intertwined with the risks of litigation," and that, here, several risks are present, including: "(1) whether Plaintiff can maintain the action as a class action; (2) whether the system used by Defendants qualifies as an automatic telephone dialing system under the TCPA; and (3) whether the Plaintiff's theories of individual and vicarious liability can succeed." (*Id.* at 6.) Plaintiff also points out that, despite the TCPA providing for damages of $500 or $1500, some courts have found that such statutory damages, when aggregated for each purported TCPA violation, violate the Due Process Clause. For example, the Eighth Circuit recently observed:

> $1.6 billion is a shockingly large amount. Compare that to the conduct of [the defendant]. It plausibly believed it was not violating the TCPA. It had prior consent to call the recipients about religious liberty, and a predominant theme of Last Ounce of Courage is religious liberty. Moreover, only the recipients who voluntarily opted in during the call heard the message about the film. The call campaign was conducted for only about a week. And the harm to the recipients was not severe — only about 7% of the calls made it to the third question, the one about the film. Under these facts, $1.6 billion is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."

*Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 962–63 (8th Cir. 2019) (quoting *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919)). Accordingly, plaintiff contends that the $2,446,666.66 that is to be distributed to class members—when viewed in light of the risks associated with continued litigation which the parties have extensively addressed in their briefing,

/////

as well as the likelihood that an award of damages in the billions would be deemed unconstitutional—is reasonable.

Although the ultimate recovery as to each class member here will depend on how many of the owners of the 232,602 cellular phone numbers who were sent text messages from the A&W Text Club during the class period submit a timely, valid claim form (Doc. No. 193 at 19), plaintiff argues that "[t]he settlement here compares very favorably to other TCPA settlements." (Doc. No. 198 at 8.) According to plaintiff, "if 5% of class members submit claims, each claiming member would recover $210, 10% would result in claiming members receiving $105, and a 20% claims rate would result in members receiving $52." (*Id.*) Such recoveries are in line those obtained in other TCPA settlements. *See, e.g.*, *Couser v. Comenity Bank*, 125 F. Supp. 3d 1034, 1044 (S.D. Cal. 2015) (approving a TCPA class settlement where each of the 308,026 approved claim members (or a 7.7% claims rate) received $13.75); *Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) ($20.00-$40.00 awarded to each class member with a 3% claims rate was "in line with recoveries obtained in similar TCPA class action settlements"); *Grannan v. Alliant Law Grp., P.C.*, No. C10-02803 HRL, 2012 WL 216522, at *7 (N.D. Cal. Jan. 24, 2012) ("[T]he relief to each class member will be in the range of $300–325, less than what the TCPA provides for a negligent violation, yet considerable when aggregated over the 1,986 opt-in class members" out of the 137,891 potential class members, or a 1.44% claim rate); *Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-CV-01413-W-AJB, 2008 WL 4155361, at *6 (S.D. Cal. Sept. 5, 2008) ($70.00 per class member, in a TCPA class consisting of "thousands of individuals," although no information was given for how many members submitted claims). Given the uncertainty of whether plaintiff could prevail in this action, and whether plaintiff could even maintain this action as a class action, as well as the fact that individual recoveries called for by the proposed settlement agreement are in line with individual recoveries obtained in other TCPA class action settlements, the court is satisfied that the proposed settlement agreement falls within the range of possible approval.

For the reasons set forth above, the court finds the settlement agreement in this case to be fair for the purposes of preliminary approval.

**B.      Preliminary Certification of the Settlement Class**

Plaintiff seeks preliminary certification of the following proposed class:  "All individuals and entities who were sent text messages from, or related to, the A&W Text Club between February 17, 2012 and the date of entry of the Preliminary Approval Order."  (Doc. No. 193 at 8.) Under Federal Civil Procedure Rule 23(c)(1), courts must determine by order whether an action should be maintained as a class action "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1).  The court must independently consider whether the proposed class meets the requirements of Rule 23 both at this stage and at the later fairness hearing.  *See Pointer v. Bank of Am. Nat'l Ass'n*, No. 2:14-cv-00525-KJM-CKD, 2016 WL 696582, at *3 (E.D. Cal. Feb. 22, 2016) (citing *Amchem Prods., Inc.*, 521 U.S. at 622).

Certification requires satisfaction of the prerequisites of Rule 23(a) and (b).  *Id.*  As noted above, courts analyzing a motion to certify a settlement class must pay "undiluted, even heightened attention" to Rule 23 requirements.  *See Amchem*, 521 U.S. at 620, n.16.  A thorough Rule 23 analysis is especially important where a motion to certify a settlement class is unopposed, because in such circumstances "[t]here is no advocate to critique the proposal on behalf of absent class members."  *Kakani v. Oracle Corp.*, No. 06-06493, 2007 WL 1793774, at *1 (N.D. Cal. June 19, 2007); *see also Pointer*, 2016 WL 696582, at *4 ("The problem is greater at this preliminary approval stage, where objectors are unlikely to have already appeared.").

On a motion for preliminary approval, plaintiff bears the burden of showing that the proposed class satisfies Rule 23 requirements.  Even at the preliminary stage, "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed. R. Civ. P. 23(c)(1), Advisory Committee 2003 Note.

1.      Rule 23(a) Requirements

"Rule 23(a) establishes four prerequisites for class action litigation, which are:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *see also Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 730 (9th Cir. 2007).  The court addresses each requirement below.

/////

### a. Numerosity

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands "examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Courts have found the requirement satisfied when the class comprises of as few as thirty-nine members, or where joining all class members would serve only to impose financial burdens and clog the court's docket. *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. Cty.*, 669 F.2d 1311, 1319 (9th Cir.), *vacated on other grounds*, 459 U.S. 810 (1982)); *In re Itel Securities Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981).

Here, plaintiff estimates that the proposed class consists of the owners of 232,602 cellular phone numbers who were sent text messages from the A&W Text Club during the class period. (Doc. No. 193 at 21.) This is clearly sufficient to satisfy the numerosity requirement of Rule 23(a)(1).

### b. Commonality

Rule 23(a) also requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class representatives must demonstrate that common points of facts and law will drive or resolve the litigation. *Dukes*, 564 U.S. at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal citations omitted). "Commonality is generally satisfied where . . . 'the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.'" *Franco v. Ruiz Food Prods., Inc.*, No. CV 10-02354 SKO, 2012 WL 5941801, at *5 (E.D. Cal. Nov. 27, 2012) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005)); *see also Parsons v. Ryan*, 754 F.3d 657, 681-82 (9th Cir. 2014). The rule does not require all questions of law or fact to be common to every single class member. *See Hanlon*, 150 F.3d at 1019 (noting that commonality can be found through "[t]he existence of shared legal issues with divergent factual predicates"). However, the raising of merely any common question does not

14

suffice.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) ("Any competently crafted class complaint literally raises common 'questions.'") (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)).

Here, plaintiff argues that the class action claims all stem from a common set of questions of fact and law regarding:  (1) whether Harman used an automated telephone dialing system to call cellular phones; (2) whether Harman knew or should have known that it called consumers without prior express written consent if it, in fact, did call consumers without prior express written consent; (3) whether a private right of actions exists; (4) whether jurisdiction is proper; and (5) whether statutory damages are available.  (Doc. No. 193 at 22.)  Because it appears that the same conduct that plaintiff alleges Harman engaged in "would form the basis of each of the plaintiff's claims," the court finds that commonality is satisfied here.  *Murillo*, 266 F.R.D. at 475 (citing *Acosta v. Equifax Info. Servs.*, *L.L.C.*, 243 F.R.D. 377, 384 (C.D. Cal. 2007)) (internal quotation omitted).

c.      *Typicality*

Rule 23(a)(3) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Armstrong*, 275 F.3d at 868; *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).  While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical."  *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Here, plaintiff alleges that his claims are based on the same type of factual and legal circumstances as those of the class members.  (Doc. No. 193 at 22.)  Specifically, plaintiff alleges that he received unauthorized text messages from Harman relating to the A&W Text Club during

/////

the class period.  The court is therefore satisfied that plaintiff's claims are reasonably co-extensive with those of the class and that typicality is satisfied here.

d.    *Adequacy of Representation*

The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The proper resolution of this issue requires that two questions be addressed:  (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000); *see also Pierce v. County of Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008).

Plaintiff contends that there are no conflicts of interest between him and the other class members, "as they are all seeking recovery under the same law for the same kind of injuries." (Doc. No. 193 at 23.)  Moreover, there is no indication of antagonism between the plaintiff's interests and those of the class members.  *See Amchem*, 521 U.S. at 626.  Plaintiff also seeks appointment of his counsel, attorneys Sergei Lemberg and Stephen Taylor of Lemberg Law, LLC, as class counsel.  (Doc. No. 193 at 23.)  The declarations submitted by counsel describing their extensive experience in consumer class action litigation are clearly adequate to establish their suitability to represent the class.  (*See* Doc. Nos. 193-2 at ¶¶ 4–5; 193-3 at ¶¶ 4–5.)  The court thus finds that plaintiff has satisfied the adequacy of representation requirements with respect to the class.

2.    Rule 23(b)(3) Requirements

The parties seek certification under Rule 23(b)(3).  Rule 23(b)(3) requires:  (i) that the questions of law or fact common to class members predominate over any questions affecting only individual members; and (ii) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615.  The test of Rule 23(b)(3) is "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).  The court will examine each of the requirements in turn below.

16

### a. Predominance

First, the common questions must "predominate" over any individual questions. While this requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis. *Dukes*, 564 U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150 F.3d at 1022 (9th Cir. 1998). While Rule 23(a)(2) can be satisfied by even a single question, Rule 23(b)(3) requires convincing proof the common questions "predominate." *Amchem*, 521 U.S. at 623–24; *Hanlon*, 150 F.3d at 1022. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

As discussed above, plaintiff alleges in the FAC that Harman used an automated telephone dialing system to send him text messages without his prior express written consent. The central inquiry then is whether Harman violated the TCPA by sending these allegedly unauthorized text messages, an inquiry that presents a significant aspect of the case and can be resolved for all class members in a single adjudication. The court therefore concludes that the predominance requirement has been satisfied in this case.

### b. Superiority

Rule 23(b)(3) also requires a court to find "a class action is superior to other available methods for the fair adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In resolving the Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing separate actions individually, any litigation already in progress involving the same controversy, the desirability of concentrating in one forum, and potential difficulties in managing the class action—although the last two considerations are not relevant in the settlement context." *Palacios*, 2015 WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc.*, No. 10-0616, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

A class action is superior in this instance to any other available method for adjudicating this controversy. As discussed, plaintiff estimates that the proposed class consists of the owners of 232,602 cellular phone numbers. (Doc. No. 193 at 21.) The court system would be

17

significantly burdened if all class members were to litigate their claims individually. The court therefore concludes that this dispute appears well-suited for class-wide resolution.

**C.    Proposed Class Notice**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). For a class certified under Federal Rule of Civil Procedure 23(b)(3), the notice must contain, in plain and easily understood language: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) that a class member may appear through an attorney if desired; (5) that the court will exclude members who seek exclusion (6) the time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on members of the class. Fed. R. Civ. P. 23(c)(2)(B). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 561 F.3d 566, 575 (9th Cir. 2004) (internal quotations and citations omitted).

Plaintiff represents that the "Settlement Agreement calls for a process that the Parties anticipate will provide individual notice by mail to the vast majority of the Settlement Class Members." (Doc. No. 193 at 25.) That process requires the settlement administrator to review the A&W Text Club's messaging records and then "perform a reverse lookup of class members' current or last-known address information, and [] then cross-reference this information with the United States Postal Services' change of address database to confirm its accuracy." (*Id.*) The settlement administrator will also "maintain a case-specific website to post relevant documents (the Settlement Agreement, the Complaint, any Preliminary Approval Order) in addition to the Long Form Notice." (*Id.*) Accordingly, plaintiff seeks approval of two notices: (1) a post-card notice that will be mailed to "the vast majority of the Settlement Class Members"; and (2) a long-form notice that will be posted on a case-specific website that the settlement administrator will maintain. (Doc. No. 193 at 25–26.) Both the long-form and post card notices describe the terms

18

of the settlement and the claims and defenses at issue, inform the class of the proposed attorneys' fee and incentive award amounts, provide information concerning the time, place, and date of the final approval hearing, and inform absent class members that they may enter an appearance through counsel. (Doc. No. 198-2 at 2–9.) The proposed notices also advise absent class members as to how they may object to the proposed settlement or opt out of it. (*Id.*)

The court notes that the proposed notices require putative class members to submit a claim form to recover their *pro rata* share of the settlement fund. (*See* Doc. No. 198-2 at 46) ("By completing and submitting a Claim Form you may recover a pro-rata share of the Settlement Fund. This is the only way to claim and receive money from the Fund."). Plaintiff contends that "[i]t is typical in class action settlements under the [TCPA] to require settlement class members to submit valid claim forms in order to recover their portion of the fund." (Doc. No. 198 at 2.) Plaintiff contends that a claim form is necessary here because defendant Harman "does not have the names and addresses of class members," and proposes the following two-pronged plan for providing notice and receiving claim forms. (*Id.* at 3–4.) "First, to identify class members and provide notice, the [settlement administrator] . . . [will] perform a reverse directory search and lookup to append names and address[es] to the cellular telephone numbers in the class data." (*Id.* at 4.) From that search process, the administrator will send individual notices to the physical addresses that have been successfully identified. Each notice will have a dedicated claim number ID which corresponds to a specific unique number in the class data. (*Id.*) Second, after receiving the notice (either by mail, or via the case-specific website that the settlement administrator will maintain), the putative class member will fill out a claim form, on which they will submit their name, address, and either (1) the claim ID if they received one or (2) the phone number to which A&W text messages were sent. (*Id.*) The claim form requires members to "certify and affirm that the information I am providing is true and correct to the best of my knowledge and belief." (*Id.*) Plaintiff contends that if claim forms are not used, "we risk several problems," including the potential of "mailing out hundreds of thousands of checks without any confirmation or affirmation that the payee is a class member, wants to participate, or is at the right address." (*Id.* at 5.)

In most contexts putative class members, as a result of class certification and in the absence of opting out of the class, are participating in the settlement, and need not submit a claim form or "opt-in" to the action. However, here, the court finds that a claim form will serve as a useful check to prevent fraud and to ensure that the settlement fund is distributed to class members who deserve to recover from it. Indeed, district courts have approved the requirement that putative class members submit claim forms in other TCPA class actions like this one. *Robinson v. Paramount Equity Mortg.*, LLC, No. 2:14-cv-02359-TLN-CKD, 2017 WL 117941, at *8 (E.D. Cal. Jan. 10, 2017) (preliminarily approving a TCPA class action settlement, and noting that "it is not uncommon for a settlement to require class members to submit valid claims, even though some class members may fail to do so, going uncompensated for releasing their claims"); *Lambert v. Buth-Na-Bodhaige, Inc.*, No. 2:14-CV-00514-MCE, 2015 WL 4602942, at *1 (E.D. Cal. July 29, 2015) (preliminarily approving a TCPA class action settlement and approving the use of a claim form in the class notice).

Accordingly, the court finds that the proposed notice meets the requirements of Rule 23(c)(2)(B) and the parties may require putative class members to submit claim forms.[2]

**D.      Settlement Administrator and Settlement Administration Costs**

The parties have selected KCC Class Action Services ("KCC") as the settlement administrator in this case. (Doc. No. 193 at 11.) The court has reviewed the declaration of Carla Peak, KCC's Vice President of Legal Notification Services, and is satisfied that KCC can diligently and effectively carry out its duties as the settlement administrator in this action. (*See* Doc. No. 193-4 at 2–3) ("KCC is a leading class action administration firm that provides comprehensive services, including legal notification, email, and postal mailing campaign implementation, . . . settlement fund escrow and reporting, as well as other related services critical to the effective administration of class action settlements.").

---

[2]  Attached to plaintiff's supplemental briefing are updated proposed postcard and long-form notices. (*See* Doc. No. 198-2 at 2–9.) These are the notices that the court is approving, and the parties are to disseminate these notices to the putative class members. Similarly, the claim form that the court is approving is that which plaintiff attached to his supplemental briefing. (*See* Doc. No. 198-1 at 3.) This is the claim form that the parties are to disseminate to the putative class members.

Plaintiff states that the estimated cost of claims administration in connection with this proposed settlement is $209,557.00. (Doc. No. 193 at 11.) As discussed, these costs will be deducted from the settlement fund. (*Id.*) The budgeted claims administration costs are within the range of other proposed settlements submitted to this court and do not cause the court to question the preliminary fairness of this settlement. *See Dakota Med., Inc. v. RehabCare Grp., Inc.,* No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for $4.5 million settlement); *Mitchinson v. Love's Travel Stops & Country Stores, Inc.*, No. 1:15-cv-01474-DAD-BAM, 2016 WL 7426115, at *1 (E.D. Cal. Dec. 22, 2016) (administration costs up to $20,000 for $290,000 settlement).

**E.    Implementation Schedule**

The court finds the following schedule is appropriate and adopts it:

| Event | Date |
|---|---|
| Notice mailing deadline (commencement of Notice Plan) within: | Thirty (30) days after entry of Preliminary Approval Order |
| Attorneys' Fees and Costs application due within: | Sixty (60) days following the Notice mailing deadline |
| Incentive Award application due within: | Sixty (60) days following the Notice mailing deadline |
| Last day for class members to opt-out of the class settlement is: | Ninety (90) days after the Notice mailing deadline |
| Last day for class members to object to the class settlement is: | Ninety (90) days after the Notice mailing deadline |
| Last day to submit a valid claim form is: | Ninety (90) days after the Notice mailing deadline |
| Briefs in support of final approval (including declaration regarding Notice by Settlement Administrator) are due: | Fourteen (14) days prior to the Final Approval Hearing |
| Defendant Harman is to file certification regarding CAFA notice requirements: | Fourteen (14) days prior to the Final Approval Hearing |
| Final Approval Hearing | June 15, 2020 |

**CONCLUSION**

For the reasons stated above, plaintiff's unopposed motion for preliminary approval of class action settlement (Doc. No. 192) is granted, and:

1. Preliminary class certification under Rule 23 is approved;

2. The following settlement class is conditionally certified for settlement purposes: "All individuals and entities who were sent text messages from, or related to, the A&W Text Club between February 17, 2012 and the date of entry of the Preliminary Approval Order."

3. Named plaintiff Cory Larson is appointed as the class representative;

4. Plaintiff's counsel, Sergei Lemberg and Stephen Taylor of Lemberg Law, LLC, are appointed as class counsel;

5. KCC Class Action Services is approved as the settlement administrator;

6. The proposed notices and claim form are found to conform with Rule 23 and are approved;

7. The proposed settlement detailed herein is approved on a preliminary basis as fair and adequate;

8. The hearing for final approval of the proposed settlement is set for June 15, 2020 at 4:00 p.m. before the undersigned in Courtroom 5, with the motion for final approval of class action settlement to be filed twenty-eight (28) days in advance of the final approval hearing, in accordance with Local Rule 230; and

9. Plaintiffs' proposed settlement implementation schedule is adopted.

IT IS SO ORDERED.

Dated:  __**December 18, 2019**__                    _____

UNITED STATES DISTRICT JUDGE